Our second case is 25-1188, City of Southfield General Employees' Retirement v. Advance Auto Parts, Inc. Counsel, whenever you're ready. May it please the Court. I'm Dana Kersvang for the City of Southfield General Employees' Retirement System. We are here today just on whether there is enough in this complaint to survive a motion to dismiss. We need a strong inference of scienter, but all that means is that the inference here that they were severely reckless as to the risk of misleading investors is at least as strong as the innocent inference. If it's even the same, we get a chance to prove our case. And the defendants here said things that were not true based on false accounting. Those things were material, and they caused the stock price to plummet. There's no dispute about those things. The district court found materiality, and that's not being appealed. So in addition to that, the CEO and CFO described themselves as laser-focused on margins and costs. They got a lot of questions from investors on margins and costs, and they had used these vendor incentives to mask margins in the past, just the year before. So can I ask you about that statement? It seems logical that CEOs and CFOs would always be focused on margins and costs, but the question, I think, is whether or not they were focused on this subset of margins and costs, these vendor credits and the other category, which I forget at the moment. Why would they have been focused on that? Sure, Your Honor. For one thing, it's their critical accounting policy, right? They say in their SEC filings, which they all sign, that this is the first of two critical accounting policies. It really matters because they have this whole turnaround story about increasing margins for this company that they say, you know, going into their performance reviews and bonus is going to set them up for a really good 2023. And these are the numbers that tell them if they are doing it right. So we have the critical accounting policy. We have the fact that this is key to their turnaround story. And then we have the fact that they've done it before, that the year before they used these vendor incentives to mask product margins. A confidential witness saved an e-mail from the Senior Vice President of Finance saying that they were, in fact, masking margins with vendor credits. Then we have the fact that the biggest bump comes in right before that shareholder vote on pay package and bonus calculations. And I think another thing that is really critical here and sets this case apart from some of the others is that it's not until somebody else steps in to supervise that the facts start to come out about this false accounting. And the remediation includes getting rid of the CAO and CFO. They say that explicitly. And, of course, they also, the CEO also retires. They bring somebody in early. Can I ask you about this issue with respect to the confidential informant? Absolutely. Is it your claim that the informant testified or a witness testified that these individual defendants did the same thing? So the confidential informant would testify that Advance Auto did the same thing. But not these individual defendants. Right. So the confidential informant's e-mail exchange was with the Senior Vice President of Finance. And that person acknowledged that they were masking the margins. And then the confidential informant believes, but doesn't have a smoking gun conversation because we don't need a smoking gun, the Supreme Court said in teleps, but that person believes that everybody at the chain was following this, talked about management at the top levels being obsessed with these numbers. Well, that's his personal belief, but what's the evidence that that actually happened? Right. So we have the fact that Greco and Shepard, right, the CEO and CFO, are repeatedly talking about being laser focused on margins and costs, the critical accounting policy, the timing in terms of this big bump right before their shareholder vote and pay packages. And the fact, and this makes this different from cases like Yates, it was not until after somebody else stepped in to supervise, right, the chairman of the board steps in, they get rid of this, the first thing comes out, they get rid of the CAO and CFO as part of the remediation, a new CEO steps in, and it's only then that they start to issue restatements. So with respect to the pay packages, you just mentioned that, so I'll ask you about that. So a couple things about that. The shareholder vote was not, I mean, that package had already been approved, right? The shareholders weren't approving a pay package. So the say and pay vote, I mean, the shareholders get to get their say on pay, right? So it's not, we don't know what would have happened had they voted it down, but we do know that they had to go before the shareholders and justify their pay based on company performance. Company performance from a different time period that had nothing to do with this period. Oh, no, no, no. I'm sorry, that's a big misunderstanding, Your Honor. So the say and pay vote, that is the spring of 2023. They're looking at the 2022 numbers. That biggest false accounting, it's like a quarter of all of the false accounting happens in that last quarter of 2022. And that lets them tell the story, which you can see in their investor call at JA256 to 289, lets them go into their say and pay vote telling the story that even though 2022 wasn't that good, their margins really improved in that last quarter because of that false accounting. And because the margins really improved, they say, we're well positioned for a really good 2023, right? So their whole story about their success, their success of their three-year margin improvement initiative turns on this false accounting. And the biggest false accounting is right before that say and pay vote. Then, you know, right after that, when the first quarter of 2023 numbers come out, those aren't good. So the chairman of the board steps in. This starts to unravel. But going into that say and pay vote, they have those numbers. And this court in Boykin, it talked about, you know, maybe they're a performance review, right? Defending your pay based on company performance is way more than a performance review. We also, of course, have the bonus for the CEO. That was a six-figure additional amount of money that he got because of this false accounting. Something like 20% of the CEO and CFO bonuses came from the false accounting. So. Just to understand your theory of the case, it's not, you don't have any evidence that these executives actually knew or were engaged in this false accounting. But they either, it's more, I guess your theory is, well, correct me if I'm wrong, that they should have known and were reckless in not knowing if they didn't. Well, we don't have a conversation that they knew, right? So them being reckless is enough. I think there's enough here to think that they did know. But being reckless is enough to get us a chance to prove our case. And here, you know, where they have their critical accounting policy, something they've messed with before. They have this big bob. You know, they called it a critical accounting policy in their SEC filings, which they all signed off on. So, you know, even if they just did that and then nobody checked to make sure they were following it, that would make this a case like Avaya out of the Third Circuit. But we have a lot more than that here in terms of the timing with the pay, in terms of their laser focus on margins. And, of course, the inference that they were at least reckless just needs to be equally strong as any kind of innocent inference. And respectfully, the district court really missed some things here, right? The district court didn't talk about any of these things because it thought that the fact that they had disclosed information later shows good faith. And that just makes no sense. It especially makes no sense here because it wasn't the same people who disclosed it later. And in general, it can't be right that it's not fraud if it gets disclosed later, right? The Seventh Circuit Intel Labs talks about investors don't want to ride a roller coaster. So there are real reasons that a company without the security laws that protect the market would want to hold off on releasing information until the Seventh Circuit said it's like embezzling funds and then trying to win the money back at the racetrack. You want to make things sort of smooth out. If there are no further questions, I'd like to reserve the remainder of my time. I have one short question. Yes. Given the decrease in the share value, one of those officers actually lost way more than he stood to gain. Like, I think it was somewhere in the record about 12 times. How does that fall into your theory or support your theory that those officers actually knew? Yes, Your Honor. So, first of all, nobody actually lost money on the stock, right? They just didn't make as much money as they would have made, but they didn't pay for that stock. So they're still selling it. It was $50 a share at the end, which is down two-thirds, but it's still $50 a share. There's no rule that executives have to dump their stock, this court said in Zack. And there are a lot of both rules and practical reasons that an executive wouldn't do that, would hold on to stock. But I think the key here is that nobody ever falsifies accounting expecting to get caught, right? When you're stealing from the cookie jar, I assume you're hoping that you're going to get money and you're going to be able to put the money back, and it's going to be like the Seventh Circuit said. You're going to keep your investors off the roller coaster, and your share price is going to stay high. But here, you know, they ran out of time. The first quarter of 2023 was bad. The chairman of the board steps in to, in his words, provide oversight, and that's when the information starts to come out. So I don't think that anybody thinks that they went into this with a plan of taking the stock. Can I ask you about the issue of the size of these errors? You know, $100 million in the abstract is a huge amount of money. I think all of us would love to have that. I wouldn't be here. I'd be in an island in the Caribbean if I had $100 million. But your colleagues on the other side say that it matters what you're comparing that huge amount in the abstract to. They say that it's appropriate to compare it to Advance Auto's total revenues, which apparently were $11 billion in the relevant time period. You say, no, no, no, no, it's operating income. Why do you say that? Sure, Your Honor. Just to take us, it's operating income because operating income really matters, right? This is one thing they were focused on. This is what their bonuses turned on, and their operating income is $114 million. So when your income that you're, you know, using as a business is off by a lot, you know, that's the kind of thing that would show up. It's also in terms of whether this is a big deal. I mean, the district court held that it was material, and it made the stock price plummet. So we really already know that it's a big deal. I think even more than operating income, you should be comparing it to margins. And margins, you know, they're laser focused on those. They're tracking them in basis points, which is a hundredth of 1%. And when you're looking at something in the hundredth of 1%, you are way more likely to notice if it is off by this much. Of course, you know, in addition to the size, the fact that they and the investors are laser focused, we also have the timing, the fact that it doesn't get disclosed until other people come in, the fact that the CAO and CFO leave abruptly as part of what Advance Auto later describes as remediation. This is something that I think may not be entirely true. You said it doesn't get disclosed until new people come in. At least one of the periods of time was disclosed by these defendants, right? Sort of, Your Honor. So they have that bad first quarter. The chairman of the board steps in, and it's when the chairman of the board steps in that they disclose that first $17 million. But at that point, also, the CEO isn't forthcoming. There's this back and forth in the call with investors where somebody says, you know, you're revising your numbers down. You have this bad quarter. You said margins were good. What's going on? Is it something internal? Is it something external? He says, oh, this is external. This is about, you know, competition on our professional products. He's not forthcoming about the accounting issues even then. And they don't say restatement until they have a new CEO. And my friend on the other side makes the point that they don't have the new CFO and CAO then. That's true, but it just underscores how abruptly these people left. They have acting new, you know, the new acting team in place by the time they say restatement. And, you know, the amount of time here, it's not until November, right? It's about six months after that first $17 million when the CEO was talking about external factors. That amount of time is also really different from those cases where the same people are in charge and they're trying to, you know, work to release information as it comes out. All right. Thank you. You still have time. You've got five minutes left for rebuttal. Thank you, Your Honor.  Mr. Regan. Good morning, Honors. May it please the Court. My name is William Regan with Hogan Lovells. I will be presenting the majority of the argument on behalf of Advance Auto Parts and its senior executives today. My partner, Ms. Wirtz, will discuss the Reform Act safe harbor and the puffery arguments that were raised below but not addressed in Judge Deaver's decision. We very much appreciate the Court's time today and in hearing oral argument. This is a securities fraud class action that plaintiff appellant tries to cobble together from two largely unrelated sets of facts. First, the plaintiff alleges that Advance corrected three sets of accounting errors over the course of 2023, one through what we call an out-of-period adjustment and two through what are called little-R restatements or revisions. Second, plaintiffs allege that Advance Auto issued a forecast, financial forecast, for 2023 in February of that year and then reduced the forecast at each quarter end in May, August, and November. In reviewing these allegations, I think it's important to start with the unique statutory and case law framework that governs securities cases. As this Court has repeatedly recognized in cases such as Janney v. Sempra, Boykin v. K-12, Cozzarelli v. Inspire, Teachers Retirement v. Hunter, and Ottman v. Hanger, Congress adopted the Private Securities Litigation Reform Act to limit and curtail abusive securities class actions. In furtherance of that goal, the Reform Act does a number of things, the most important of which for today's purposes are the heightened pleading standard. To survive a motion to dismiss in a securities class action, the plaintiff must plead particularized facts demonstrating that the defendants made material false statements with the intent to deceive their investors. The intent or scienter element is key. Scientry can be shown by demonstrating either that the defendants had actual knowledge, that their statements were false when made, or that the defendants were reckless in the extreme, with recklessness in this context being something close to or tantamount to intentional misconduct. And that was this Court's holding in C. Z. v. Duratech. Under the Reform Act, the plaintiff must plead facts giving rise to a strong inference of scienter. In Tellabs, the Supreme Court held that an inference of scienter is strong only if it is cogent and at least as compelling as any non-fraudulent inference. So in that case, the Supreme Court established essentially a comparative weighing analysis. This Court must compare the inference of misconduct that plaintiffs proffer against any competing innocent explanations for defendants' conduct and determine if the Reform Act standard is met. This Court's securities class action precedents make clear that the plaintiff needs to show fraud through intentionality, bad accounting or inaccurate forecasting is not sufficient as a matter of law, negligence or even gross negligence does not suffice, and certainly fraud by hindsight allegations do not meet the Reform Act test. So with that framework in mind, I think it's important to note. You said bad accounting wouldn't suffice, but I suppose if it were really egregiously bad such that it would have been obvious to someone had they bothered to look, that might be enough, no? Theoretically possible, but there are multiple cases in this Court. We can get to that in just a moment where there were similar or even worse accounting issues that arose. In absence of some evidence of intentionality, this Court consistently finds that scienter is not met. Problematic accounting happens particularly in large complex businesses like advance, but you still need some indication that there's intentionality. Maybe it's bad accounting plus stock sales or something along those lines. So bad accounting alone generally is not sufficient to show scienter. You could imagine a situation where a company has one product, and the accounting is so egregiously overstated that you could infer from the nature of the accounting errors that the executives here knew that the accounting was bad. So yes, theoretically possible, the accounting errors could be so egregious and so central to the company's business that scienter could be established. Does it depend on the role of the defendant? I mean, you've got three different people here, the chief executive, the CFO, and then an accounting manager, I think. It would seem that that last person might be someone who might be held to a different standard with respect to accounting errors. It certainly would be a fair inference that that person was at least one step closer to the issues. You would still need to infer that that person acted with intentional misconduct, not that the person was negligent or grossly negligent, but the fact that they are the chief accounting officer, they're at least one step closer to accounting issues, and it would be fair to put that fact on the scales of the TALAB's weighing analysis. So your colleague on the other side says that these folks were, as she puts it, laser-focused on margins and costs, and she says that the corollary of that is that necessarily that's connected to this issue of vendor credits and returns because those two go hand in hand. Do you agree with that? No. I don't think that the plaintiff's allegation here fairly represents what is said and what is not said in the earnings calls that they quote. Analysts constantly ask Advance Auto in the transcripts that are before the court in the record, how are you doing in terms of improving top-line sales, your gross revenue? How are you doing in terms of improving margins and being more profitable? And the laser-focused quote, if you read it in context of the question, the answer is we are laser-focused on our business. We are trying to grow the top line and, at the same time, improve our margins as well. So I think it's sort of a generic statement that we are executives and we care about the business and we're trying to grow the top line and the bottom line. I don't think it's anything more than that. So I think touching on where Judge Groh started before. Oh, you promoted her. It's inevitable, right? For the accounting allegations, I think it's important to start with what the plaintiff does not allege. There's no document in the complaint showing that anyone knew the accounting was problematic. There's no former employee allegation saying that anyone at Advance knew any of its financial statements were inaccurate at the time the financial statements were issued. Although there is this synonymous employee that suggests that, in some other context, folks may have had knowledge. I mean, what are we supposed to do with that? I don't think the court should credit that person at all. The person did not work at the company during the class period, so the person cannot speak to anything that was true or not true during the class period. The complaint also does not provide the required indicia of reliability. The person's name is not given. Their title is not given. They work in the financial planning and analysis group and not the accounting group. There's no indication of who the person reports to, and there's no indication that the person ever spoke with any senior executive at the company. So these are very vague and ambiguous allegations with no detail provided, and therefore they don't meet the particularity requirements of the Reform Act. So no former employee allegations, and I think that's particularly striking here because if it was true, as plaintiffs allege, that a public company was intentionally misstating its financial statements for nearly three years, somebody would have said something somewhere along the way. The fact that they have no former employees attacking the accounting is, I think, a telling absence. Also missing from the complaint is any allegation, as you see in some other cases, that the court has decided of an SEC enforcement action challenging the company's accounting or an auditor resignation. There are none of those other potential indicia of fraud here in this case at all. Same with respect to the forecast allegations, no documents, no former employees, no anything suggesting that anyone at advance knew its forecast was not achievable on the day it was issued. This is all fraud by hindsight. So the employees were let go. What do we make of that? Companies have turnover, particularly when the business is not performing well, and that's really what happens here. I think the plaintiffs would ask the court to assume that people left because of some fraud or misconduct, and I don't think the chronology supports that. The first indication of accounting problems was at the end of Q1 2023 in May, and there advance discloses a $17 million accounting problem that it fixes through an out-of-period adjustment. At the same time, with the CEO, the CFO, and the CAO, the three individual defendants still employed by the company, advance discloses a material weakness in its internal controls over financial reporting. It says basically we don't have enough accounting personnel on hand, and that's causing us problems. So the defendants just voluntarily disclose that to the market. The defendants voluntarily disclose the first accounting correction. At the same time, they also lower the forecast. So the notion that some new management came in and saved the day and discovered the fraud just doesn't hold up when you read the chronology of when the accounting errors were noticed, when the forecast was lowered, and when the internal weakness was reported to the market. Well, your colleague on the other side says that that first disclosure wasn't complete in the sense that the reason given masked the real reason. She says it was that they asserted that it was an issue of competitiveness in the broader market when, in fact, it was these accounting snafus that caused the problem. I think your Honor is referencing the external factors argument that they advance in the complaint. I think that suffers from a threshold problem that it's really a Frankenstein quote. That's not what the company said. If you look at the quote in the complaint and then open up the earnings call transcript that it's taken from, the excerpts come from page 5, page 7, and page 23, and they're Frankensteined together to make it look like. . . I was about to ask you what you meant by that, but I explained it. Yeah, it was a selective editing exercise in the complaint to make it look like the analyst said, hey, what was the cause of you lowering the forecast? And the answer was external factors. And certainly external factors were cited, but a whole host of factors over the course of 30 pages were cited, so I don't think the quote fairly represents what was said. And even if the executive did point to external factors, there's nothing in the complaint that says that wasn't a contributory factor. The company announced that it was experiencing more competition in the professional segment than it had previously experienced before, and that was causing it to adjust prices downward and therefore try to grow the top line but hurt margins at the same time. So I don't think the external factors. . . Mr. Regan, do you admit that they did anything wrong? They did not account for the business well, I think, and the forecast was not great. It was off by a significant margin, but there's no fraud here. There's no intentionality here at all. Well, I mean, certainly they would know if you subtract the vendor credits from the cost of goods and keep your net sales the same, you're going to inflate margins, right? Yeah, so on the vendor incentives versus vendor credits, I think the complaint assumes too much is probably the way to think about it. When Advance announced the second and third sets of accounting issues, that's the only time it said what the cause was, and it said that the issues were related to product returns and vendor credits. Product returns is if Advance needs to return an item to a vendor for any reason. It doesn't work, the customer didn't want it, they're not selling. Advance returns the product to the vendor, and the vendor owes Advance some form of credit. Vendor incentives are something very different, and Advance never attributed any of the accounting issues to vendor incentives. Vendor incentives are essentially coupons or discounts that a vendor might offer Advance, or promotional allowances for that matter, but coupons are discounts that Advance might be offered by a vendor in order to promote products. Did they subtract those? Eventually, but they are required to, but the accounting is far more complicated than that. If you look at the critical accounting policy that is quoted in the complaint, it is an incredibly complex process as how to deal with vendor incentives. There are, I think, more than 1,400 vendors that the company has, and through those vendors the company buys more than 23,000 products. And the accounting question turned on things like, is the vendor offering something that is specifically attributed to one particular product? Is it quantifiable? And when is it going to come to pass? Is it going to come to pass this year or next year? And if you go down one path, you end up immediately subtracting the way Your Honor was calculating from selling general and administrative expenses, SG&A. If it's not quite that identifiable, if it's not going to happen this year, or you can't quantify it, the accounting gets even more complicated. Then you have to sort of treat it as deferred revenue. It gets recorded initially as a reduction to inventory, and then the following year when the product gets sold, it gets treated as a reduction to cost of sales. So it's a wildly complex process. I think the more important point here is that Advance never attributed anything to vendor incentives, and nothing in the complaint goes through the analysis of the vendor incentives policy and says Advance did or did not follow it. The only word they care about in that section of the complaint is the fact that we use the word critical. And so they say, therefore, it was important, but they never actually analyzed the policy or provided any particularities around whether Advance did or did not comply with that policy. And so we talked a little bit about what was not there for both the accounting allegations and for the forecast allegations. For both sets of allegations, it's important to note that there's no financial motive. No one sold stock during the 12-month log class period, not the individual defendants, not the rest of the board, not any other employees at Advance. No one sold stock while the senior executives were allegedly out there fraudulently inflating the stock price. That is a very compelling fact. During the class period, no one at Advance or Advance never used what was supposedly and allegedly inflated stock price to go out and make acquisitions. They didn't use it as currency. And Advance did not go out to the market and raise capital from investors while allegedly overstating its financial prospects in the state of the business. And this court has held that while viable motive allegations are not 100% required, the absence of them weighs heavily against plaintiffs in the CNTR analysis. The court found that in the San Antonio Fire case versus Cineo Health, Cineo's Health, and the NRA Triangle Capital Court. So the issue for the court really is in light of any actual knowledge allegations and in light of the absence of any motive allegations, financial motive allegations, do plaintiffs' other circumstantial allegations of misconduct give rise to the strong inference of fraud required by the Reform Act? They do not. The district court referred to the plaintiff's approach in this case as shocking. I hate to interrupt you, but you're over your time. I'll let you wrap up really quickly. I think unless the court has any questions, I will turn it over to my colleague and let her address the Reform Act safe harbor and the puffery arguments. But, again, if the court has any questions, I'm more than happy to answer them. Thank you. Thank you. Good morning, and may it please the court. My name is Allison Wertz, and as Mr. Regan indicated, I will briefly address the three additional grounds for affirmance. First, that the company's guidance for 2023 and related statements are protected by the Reform Act's safe harbor for forward-looking statements. Second, that the amended complaint fails to allege facts showing that many of the purported false statements were actually false. And third, that some of the challenge statements are immaterial puffery. With respect to the forward-looking statements, the Reform Act provides that statements that are forward-looking and accompanied by meaningful cautionary language are inactual to support. Can I ask you a question? Sorry to interrupt your train of thought there. That's fine. But if we were to agree with the plaintiffs that they've made out a sufficient claim of scienter, why would we take on these issues instead of just sending it back down to the district court? The panel certainly think it's meaningful that we have two sets of allegations. Let me put it that way. So we have the forecast allegations that relate to the 2023 forecast, looking forward, and the lowering of that forecast over time. And then we have the accounting allegations, the backward-looking allegations that over the course of 11 quarters there were accounting issues that were raised. While plaintiffs tried to kind of meld those two together, they really are distinct in the sense that there was a set of statements made about the accounting, there were a set of statements made about the forecast. So it would meaningfully change the case in the scope of discovery and the scope of the issues that are present if the case were to go through fully with respect to both the forecast allegations and the accounting allegations, or if the case were cabined to just the accounting allegations. So the argument here would be that if the panel was inclined to agree with plaintiffs that there is scienter with respect to the accounting allegations or the forecast allegations, if they can't plead falsity, which is what these arguments go to, then the forecast allegations can be dismissed and the case can be substantially narrowed. Okay. So financial projections are quintessential forward-looking statements. They're right there in the definition in the Private Securities Litigation Reform Act. So the 2023 guidance and the subsequent updates in May, August, and November are all forward-looking statements. And in addition, a lot of the statements that were made in connection with the forecast and the updating are also forward-looking. For example, in paragraph 94 of the complaint, there is discussion about what AAP is planning to do going forward in 2023, for example. It's forward-looking. Paragraph 95 also mentions what Advance Auto is planning to do from here, meaning in the future. So these statements are forward-looking, and if they're accompanied by cautionary language, which they are here, they are inactionable to support a claim. And here there was sufficient cautionary language. Both the press release and the investor call, where those statements appear, contain warnings about forward-looking statements and reference Advance's Form 10-K that contains a host of risk factors, many of which are specific to the issues here. For example, there's a risk factor that says that if Advance is unable to implement its strategic initiatives effectively and efficiently, the financial condition would be affected, which is exactly what plaintiffs are saying happened here. So those statements are inactionable for those reasons. In addition, with respect to allegations of falsity, for a number of these statements, the complaint actually doesn't allege particularized facts showing that those statements were false, and Mr. Regan touched on this a little bit. But there's an allegation in paragraphs 94 and 95 that Advance Auto spoke about the majority of the integration of its business, about engaging in significant investments in complex transformation initiatives, and the complaint is entirely devoid of allegations that those things didn't actually happen. And if there are no allegations showing that those statements were false, they certainly cannot be the basis for a fraud claim. Finally, with respect to puffery, it's well established that immaterial corporate optimism or puffing statements are inactionable. And here we have a couple of statements related to elevating our performance, for example, or we're confident that we can continue to grow margins from here. These are the types of generic corporate statements that any CEO or CFO would say to the market that an investor would not view as material when making an investment decision, and for that reason, those statements are inactionable as well. If the panel doesn't have any other questions, we'll leave it at that. All right. Thank you very much. Thank you very much. Thank you, Your Honors. I think I have about five things that I want to say in response. First, I'd like to just address these supposed Frankenstein quotes. So the laser focus point, it's cited in a number of places, comes up a lot, so you can see a few sites in our brief, but I'll just point you to JA-270, where they're on an investor call, one of the investors says, on this margin guidance, can you tell us about gross margin versus SG&A, which is sort of general expenses? And Jeff Sheppard, the CFO, says, we're laser focused on both growing our gross margin while controlling our cost base, right? So he's saying the focus is, in fact, on the margins. In terms of external factors, I would point you to JA-313, where this is the investor call of May 31, right when the chairman of the board steps in to exercise oversight, and Sheppard is still... Sorry, the CEO, Greco, is still saying the external factors. So one of the investors says, so you're well into this transformation with margins, and it seems like you're taking a step back on margins and free cash flow. We had a conversation earlier about why cash is an important thing to look at. And you've cut your guidance. Is this internally catalyzed or externally catalyzed? And the CEO says, I think it's external. I mean, the dynamic has changed on the pro side, right? So he does not say anything about accounting problems there. In terms of whether there's anything showing... whether these dismissals show misconduct, this is a case where the CAO and CFO advance said in its restatement that it let them go as part of its remediation. You can see that at JA-69. In terms of vendor incentives, what they said today about how this accounting worked, it isn't in the record. We're here on a motion to dismiss and our allegation is that this was about vendor incentives. And that makes a lot of sense because the way these incentives worked, they got... you can see it at JA-53, 54. They got rebates based on the amount they sell. They get those in the form of vendor credits. So when they're in the restatement, they say vendor credits. Their rebates are in the form of vendor credits. The rebates are tiered. So, you know, for example, if you sold between $200 and $300, you might get a $10 rebate on everything, whereas if you only sold between $100 and $200, you might get a $7 rebate. I'm making those numbers up. But you get the point that a number of returns can change which tier you're in, which is why vendor returns... And what of these are violations of GAAP? These are violations of GAAP, I'm sorry. They are violations? They can't use incentives? No, no, no. I'm sorry, Your Honor. They can absolutely use incentives. Absolutely. But what are the GAAP violations? Yeah, the GAAP violation and their policy, which was consistent with GAAP, is that they're supposed to estimate what those incentives are going to be, what their actual costs are going to be, and then they're supposed to be updating that. And what they say they're doing, but apparently we're not doing, is going back and making sure that their estimates are right. Now, I mean, this might seem technical, but it was their critical accounting policy, right? It was the first of one, they told SEC. That's kind of difficult, though, if your point is correct, assuming that it is, to get that to the point of the high level of Santa required because that's a little high. It's close to fraud, if not fraud, almost in terms of pleading. I'm talking about the pleadings then, right? Yes, Your Honor, it is fraud. And if you think, if you're estimating something and you're doing it in good faith, sometimes you're going to be high, sometimes you're going to be low. That's not what happened here. They were always wrong in the way that helped them to the tune of $100 million. Being wrong may not be enough, though, for the pleading standard. Yes, Your Honor, and I didn't mean to say that I think they are only wrong. I'm just saying that if you're estimating in good faith, you're going to be off in both directions. The fact that they've monkeyed with these numbers before and then they come in with $100 million that all go the same direction, all go to pump-up margins, really tells you that this, at least we should get a chance to prove our case here. Well, you know, that's one of the problems, though, the reason why the law is as it is. It's not just enough to say, I get enough to go in there. I mean, a lot of companies would spend a whole lot of money on these cases like this. People could do it sort of, well, I think it's wrong. You did it right. The better way to do it wasn't best practices. Those kind of things, we don't want to do that. I mean, I'm not saying that, but that's what, as a court, we look at in terms of what the purpose was, right? And that's what the district court is looking at, whether or not you really have done enough in terms of pleading to be able to go in and make companies have to spend a lot of money on attorney's fees and all kind of things like that to either win or lose. But go ahead. Thank you, Your Honor. I know I'm out of time, so I'll make it. The Chief is allowing me to do it. Great. So there are accounting questions that are tough, right, where people make mistakes. This isn't one. This was their critical accounting policy, that in that same 10-K filing that they all sign right before their pay packages and their bonuses are calculated, they say this is our critical accounting policy. We are reviewing these estimates. We are making sure they're correct. You can see that at JA 5354. So this isn't something. This isn't in that category. This is something that they said was critical, that they're really focused on because it's important to their story. That they have monkeyed around with to hide margins before. I didn't get to the confidential witness, but if you just go back and look at JA 3132, you can see that this is somebody who really knew what they were talking about. Their job responsibilities are monitoring margins, and they are in the part of the company that supports those vendor credit and vendor rebate process. So when you look at all of that together as you need to do, I think we should at least get a chance to prove our case here. If there are no further questions, I ask that the court reverse. Thank you very much. I want to thank all three counsel for their fine arguments this morning. We'll come down and greet you and adjourn for the day.
judges: Albert Diaz, Roger L. Gregory, Gina M. Groh